UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

3CEMS,

    Plaintiff,

v.

PERCEPTRON, INC.,

    Defendant.
_____/

Case No: 14-14951
Honorable Victoria A. Roberts

**ORDER:**

1. **DENYING DEFENDANT PERCEPTRON, INC.'S MOTION FOR SUMMARY JUDGMENT [DOC. #34]; AND**

2. **GRANTING IN PART AND DENYING IN PART 3CEMS' MOTION FOR SUMMARY JUDGMENT [DOC. #35]**

## I. INTRODUCTION

In July 2007, Perceptron Inc. ("Perceptron"), 3Cems, and non-party Odyssey Electronics, Inc. ("OEI") entered into a supply agreement ("Agreement") for the OS6 project. The OS6 was a hand-held inspection camera with an optical scope attached to a flexible cable. Under the Agreement, 3Cems was to purchase components and manufacture the OS6, which Perceptron would then supply to its customers.

Perceptron was to pay for any parts 3Cems purchased and manufactured on its behalf. Perceptron issued a purchase order for 100,000 units, but only paid for 30,000 units; – 70,000 units remain idle in 3Cems' warehouse. 3Cems filed a single-count breach of contract complaint against Perceptron. 3Cems alleges that Perceptron

1

breached the Agreement and the Guarantee Letter when it failed to pay for the ordered parts. Perceptron says that it does not owe 3Cems damages because 3Cems has no right to sue since its suppliers and not 3Cems purchased the units. 3Cems and Perceptron filed cross-motions for summary judgment.

The Court **GRANTS** 3Cems' motion in part and **DENIES** it in part. The Court **DENIES** Perceptron's motion.

## II.  BACKGROUND

To get the lowest price, 3Cems utilized its parent companies, such as Prime Foundation Inc., i-CEMS, and Prime Technology as suppliers. Prime Foundation shares the same board as 3Cems and controls cash flow. Prime Technology operates the facility that manufactured the OS6.

I-CEMS and Prime Technology issued purchase orders to its suppliers in the United States and Asia for the OS6 component parts ordered by Perceptron. They directly paid their suppliers for parts. While Prime Foundation, Inc. reimbursed the suppliers, 3Cems was ultimately responsible to purchase and manufacture the parts for the OS6 under the Agreement.

Under Section 11.4 of the Agreement, 3Cems "may assign this Agreement without the other party's prior written consent to an entity it controls, is controlled by, or is under common control with." In addition, it may "subcontract with other parties to satisfy any of its obligations under the Agreement."

Paul Eckhoff, Senior Vice President for Perceptron and Hongji Shieh, Vice President of Prime Technology and Prime Foundation, signed the Agreement. Eckhoff reported directly to Perceptron's Chief Executive Officer and was the highest-ranking

Perceptron representative with direct contact with 3Cems. Shieh manages the OS6 project for 3Cems and is an employee of all of its subsidiaries.

Perceptron forecasted that it would sell 125,000 OS6 units. In February 2008, Perceptron had OEI issue a purchase order to Prime Technology for 100,000 units. 3Cems wanted assurance that Perceptron would pay the $18,874,000 purchase order, so 3Cems required Perceptron to sign a Guarantee Letter. In June 2008, Eckhoff signed a Guarantee Letter for Perceptron; Perceptron agreed to pay for any "tooling cost [and] idle material costs on the OS6 series projects between Odyssey Electronics Inc. and Prime Foundation Inc."

3Cems ordered the 100,000 parts. Perceptron only accepted and paid for 30,000 parts. In 2008, 3Cems contacted Perceptron to let it know 70,000 parts remained stored in 3Cems' warehouse and Perceptron needed to pay. Eckhoff reassured 3Cems that he would work to get the parts paid for.

Perceptron refused to pay 3Cems. 3Cems filed suit in 2013. In 2014, Perceptron and 3Cems signed a tolling agreement ("Tolling Agreement"); they agreed to toll the statute of limitations from July 2013 until December 2014. 3Cems voluntarily dismissed its 2013 suit, and refiled the suit in 2014.

The material facts set forth above are not in dispute.

### III. STANDARD OF REVIEW

#### a. Summary Judgment

When reviewing cross-motions for summary judgment, the Court must assess each motion on its own merits. *Federal Ins. Co. v. Hartford Steam Boiler Insp. and Ins. Co.*, 415 F.3d 487, 493 (6th Cir. 2005).

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant has the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S. Ct. at 2514 (discussing Fed. R. Civ. P. 56(e)). "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. U.S.*, 342 F.3d 493, 497 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(B).

It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S. Ct. at

4

1356, 89 L. Ed. 2d 538 (1986). Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)) (internal quotation marks omitted). The non-movant cannot rely upon bare assertions, conclusory allegations, or suspicions to substantiate his claims. *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995). If the nonmoving party does not respond with specific facts showing a genuine issue for trial, summary judgment is appropriate. *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989).

### b. Breach of Contract

To recover for breach of contract under Michigan law, 3Cems must prove: (1) the existence of a contract between it and Perceptron; (2) the terms of the contract; (3) Perceptron breached the contract; and, (4) the breach caused 3Cems injury. *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999).

## IV. DISCUSSION

3Cems alleges that Perceptron breached the Agreement and Guarantee Letter when it failed to pay for the ordered parts. Perceptron appears to initially concede that it breached the Agreement; however, Perceptron disagrees that it breached the Guarantee Letter. Perceptron claims that the ordered parts were not between OEI and Prime Foundation, as required by the Guarantee Letter. Perceptron believes 3Cems is not the rightful party to sue Perceptron for breach of the Agreement and Guarantee

Letter. In addition, the parties dispute whether the terms of the Agreement limit 3Cems' damages.

### a. 3Cems Can Rightfully Sue Perceptron For Breach of Contract

#### i. Agreement

Perceptron's argument that 3Cems is not entitled to recover because 3Cems' suppliers and affiliates purchased the OS6 component parts is unavailing.

The authority relied on by Perceptron, *Williams v. American Title Ins. Co.*, 83 Mich. App. 686, 699; 269 N.W.2d 481 (1978) and *Green v. Ziegelman*, 310 Mich. App. 436, 451, 873 N.W.2d 794 (2015), is not helpful. Neither decision pertains to a motion for summary judgment or that standard of review. Both are bench trial rulings after the presentation of evidence.

The mere fact that 3Cems used suppliers to carry out the terms of the Agreement does not diminish its rights to sue; nor does it give 3Cems' suppliers the right to sue under the Agreement. *Schmalfeldt v. N. Pointe Ins. Co.*, 252 Mich. App. 556, 562, 652 N.W.2d 683, 686 (2002), *aff'd on other grounds*, 469 Mich. 422, 670 N.W.2d 651 (2003). ("The law presumes that a contract has been executed for the benefit of the contracting parties… and the mere fact that a third person would incidentally benefit does not give the third person a right to sue for the breach of contract.")

Section 11.4 of the Agreement gave 3Cems the authority to "subcontract with other parties to satisfy any of its obligations under the Agreement." 3Cems (through its subsidiaries, affiliates, and/or subcontractors), purchased parts to manufacture 100,000 OS6 units, to fulfill Perceptron's purchase order.

All that matters is that under the Agreement, Perceptron gave 3Cems authority to subcontract in order to fulfill its contractual duty to Perceptron. 3Cems satisfied its duty, and Perceptron did not pay for the ordered parts.

As a matter of law, 3Cems can rightfully sue Perceptron for breach of the Agreement.

### b. Perceptron Materially Breached the Agreement

By virtue of its purchase order, Perceptron is obligated to pay for the 70,000 units idle in 3Cems' warehouse. *See Supply Agreement Section 3.5* ("Perceptron shall have no obligation to purchase Products from OEI or 3Cems unless and until Perceptron issues a purchase order pursuant to this Agreement.").

Perceptron issued a purchase order for 100,000 units and only paid for 30,000. 3Cems fulfilled its contractual duty to purchase and manufacture the units for the OS6 project. Perceptron failed to pay for the balance.

Perceptron's failure to pay was a material breach of the Agreement. *See Supply Agreement Section 5.3* ("The occurrence of any of the following constitutes a material breach by PERCEPTRON for which no cure period shall apply except as set forth in this Section 5.5: any failure to pay invoices…).

Perceptron concedes it did not pay for the idle parts; however, it attempts to evade responsibility by focusing on 3Cems' subcontractors. Regardless of what subcontractor or supplier purchased parts for 3Cems, Perceptron is liable to pay 3Cems for the purchased units.

There is no genuine issue of material fact; Perceptron breached the Agreement.

7

### c. Perceptron Gave Its Vice President Authority to Sign the Guarantee Letter

Perceptron does not contest that it authorized its Vice President Paul Eckoff to sign the Agreement. But, it now argues that he did not have authority to sign the Guarantee Letter or reassure 3Cems that Perceptron was going to pay for the idle parts.

Perceptron's arguments fail.

"The authority of an agent to bind a principal may be either actual or apparent." *Chires v. Cumulus Broad., LLC*, 543 F. Supp. 2d 712, 717 (E.D. Mich. 2008) citing *Alar v. Mercy Memorial Hospital, et al.*, 208 Mich. App. 518, 528, 529 N.W.2d 318 (Mich. App.1995). Express authority is authority the principal actually intended the agent to possess. *Hertz Corporation v. Volvo Truck Corporation*, 210 Mich. App. 243, 246, 533 N.W.2d 15 (Mich. App.1995). "Implied authority is the authority that an agent believes the agent possesses." *Id*. "Apparent authority arises where the acts and appearances lead a third person reasonably to believe that an agency relationship exists ... [h]owever, apparent authority must be traceable to the principal and cannot be established only by the acts and conduct of the agent." *Id*. "Any question relating to the existence and scope of an agency relationship is a question of fact." *Hertz Corporation*, 210 Mich. App. at 246, 533 N.W.2d 15.

Perceptron gave Eckoff authority to sign the Agreement. The purchase order and Guarantee Letter arise under the Agreement. Given the authority Perceptron gave Eckoff on other contracts that arose out of the OS6 project, Eckoff had apparent authority to sign the Guarantee Letter.

8

There is no genuine issue of material fact; Eckoff had authority to sign the Guarantee Letter.

### d. Guarantee Letter

#### i. Perceptron's Breach and 3Cems' Right to Sue

Perceptron argues that only one of 3cems' suppliers can sue under the Guarantee Letter and not 3Cems. There is no authority for Perceptron's position.

Perceptron breached the Guarantee Letter when it failed to pay for the ordered parts. And, the Guarantee Letter is an acknowledgment that Perceptron will be responsible for "all charges of Tooling costs and idle material costs on the OS6 series projects between Odyssey Electronics Inc. and Prime Foundation Inc" under the Agreement. Eckoff testified to as much when he said in his deposition that the intent of the Guarantee Letter was to make Perceptron liable to 3Cems for idle and tooling costs. Perceptron attempts to discredit Eckoff's testimony, characterizing him as a disgruntled employee. However, that characterization requires the Court to make a credibility determination. What is undisputed is that Eckoff is the highest-ranking employee involved in the Agreement; he had direct knowledge of the OS6 project; and, he signed the Agreement.

There is no genuine issue of material fact: Perceptron breached the Guarantee Letter and 3Cems has the right to sue.

### e. The Statute of Limitations Does Not Bar 3Cems' Claims

Perceptron raises a statute of limitations defense; however, it fails to mention that it entered into a Tolling Agreement with 3Cems.

9

Under the December 6, 2013 Tolling Agreement, 3Cems agreed to voluntarily dismiss a case it filed in July 2013 (Case No. 13-13119). The Tolling Agreement also said, "in computing any such time limitation, the parties agree that such computation shall not include the time period from and including the date of filing of the above referenced action through the termination date of this Tolling Agreement [December 31, 2014)…" The Tolling Agreement related to "the timeliness of the assertion or re-assertion of any of the claims, counterclaims, or other claims or defenses arising out of the transaction or occurrence…"

The parties agreed to toll the statute of limitations from July 2013 until December 2014. This case was filed on December 31, 2014 and the amended complaint was filed on June 6, 2016. There is a six-year statute of limitations for breach of contract claims. *See MCL 600.5807(8).*

Because the parties entered into an unambiguous agreement to toll the statute of limitations, the Court will enforce the Tolling Agreement as written. *See Hardin v. Prieskorn*, No. 311193, 2014 WL 1320184, at 1 (Mich. Ct. App. Apr. 1, 2014) (A Tolling Agreement is to be enforced as written).

As a matter of law, 3Cems' claims are timely under the Agreement and Guarantee Letter.

### f. There Is A Genuine Issue of Material Fact Concerning The Amount of Damages Perceptron Owes to 3Cems

The issue is whether the Agreement limits 3Cems' damages.

Perceptron argues that under section 3.1 of the Agreement, its liability - if any - is limited to "bill backs" – fees from a supplier for reducing the purchase quantity after an

order is placed. But, Perceptron attempts to distract the Court by arguing the wrong section under the Agreement; 3Cems seeks damages under section 3.5.

Section 3.1 pertains to changes in pricing if 3Cems enters into a contract with a supplier to order parts at a specific price point based on the number of parts ordered. If Perceptron wanted fewer units after 3Cems entered into the parts-contract, the price 3Cems pays per part would increase. The supplier then would charge 3Cems a "bill back," representing the difference in cost. Perceptron would be liable for the change in cost.

But, 3Cems is not asking Perceptron to pay for bill backs; it did not enter into binding contractual agreements with suppliers for parts, beyond Perceptron's forecasts – nor did it receive bill backs from suppliers. Bill backs are not at issue and 3Cems need not satisfy the conditions of section 3.1.

In section 3.5 of the Agreement it is clear that "[f]orecasts shall be estimates only and shall not be binding upon Perceptron…Perceptron shall not have the obligation to purchase Products from…3Cems unless and until Perceptron issues a purchase order pursuant to this Agreement." Perceptron issued a purchase order for 100,000 units, but only paid for 30,000 units.

Section 3.5 says that Perceptron is liable for what it orders; this section governs. Nothing in the Agreement supports Perceptron's position that it could order units and because sales are less than its initial forecast, that 3Cems should bear the loss for the parts ordered to fulfill the purchase order Perceptron submitted.

3Cems claims that Perceptron owes $4,000,000 in damages. It is not clear how it reaches that amount.

The Court finds there is a genuine issue of material fact regarding the amount of damages Perceptron owes 3Cems for the idle parts it purchased to manufacture the 70,000 OS6 units.

## V. CONCLUSION

There is no genuine issue of material fact that: (1) Perceptron breached the Agreement and the Guarantee Letter; and (2) Paul Eckoff had authority to sign the Guarantee Letter. As a matter of law, 3Cems has a right to sue Perceptron for breach of the Agreement and under the Guarantee Letter. The only genuine issue of material fact is the amount of damages Perceptron owes to 3Cems.

The Court **GRANTS** 3Cems' motion in part and **DENIES** it in part. The Court **DENIES** Perceptron's motion. Trial will proceed on the amount of damages only.

**IT IS ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated: December 20, 2016

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on December 20, 2016.

s/Linda Vertriest
Deputy Clerk